UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BIOMET, INC.,<br><br>    Defendant. | Case: 1:12-cr-00080<br>Assigned To : Walton, Reggie B.<br>Assign. Date : 3/26/2012<br>Description: INFORMATION (A)<br>Case Related To: 11cr099; 12cr030 (RBW)<br><br>VIOLATIONS:<br>18 U.S.C. § 371 (Conspiracy);<br>15 U.S.C. §§ 78m, 78dd-1 *et seq.* (Foreign Corrupt Practices Act); and<br>18 U.S.C. § 2 (Aiding and Abetting)<br><br>**FILED**<br>MAR 2 6 2012<br>Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |

INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

At all times material to this Information (unless specified otherwise):

GENERAL ALLEGATIONS

*The Foreign Corrupt Practices Act*

1.  The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person. The FCPA also requires that any issuer of securities shall make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

*Relevant Entities and Individuals*

2. Defendant Biomet, Inc. ("Biomet") was incorporated in Indiana with its principal place of business in Warsaw, Indiana and manufactured and sold orthopedic medical devices worldwide. Until September 25, 2007, it issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), which traded on the NASDAQ. As such, it was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, Biomet was an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a). By virtue of its status as an issuer, Biomet was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of Biomet and its subsidiaries, including those described below, which were incorporated into the books, records, and accounts of Biomet.

3. Biomet Argentina SA ("Biomet Argentina"), a wholly-owned subsidiary of Biomet, was an Argentine corporation through which Biomet conducted business in Argentina.

4. Biomet International Corporation ("Biomet International"), a wholly-owned subsidiary of Biomet, was a Delaware corporation through which Biomet sold products into Brazil.

5. "Brazilian Distributor," a Brazilian company, had exclusive distribution rights for Biomet reconstructive products in Brazil.

6. Biomet China, a wholly-owned subsidiary of Biomet, was a Chinese corporation through which Biomet sold products into China.

7. "Chinese Distributor," a Chinese company, acted as a distributer of Biomet products in China.

8. Scandimed AB ("Scandimed"), a wholly owned-subsidiary of Biomet, was a Swedish corporation through which Biomet sold products into China and elsewhere.

9. "Director of Internal Audit," a U.S. citizen, was the Director of Internal Audit for Biomet, and was based in Warsaw, Indiana.

10. "Latin America Auditor," a U.S. citizen, was an auditor at Biomet and was based in Warsaw, Indiana.

11. "Vice President," a U.S. citizen, was a senior vice president for Biomet, and was based in Warsaw, Indiana.

12. "Operations Manager," a U.S. citizen, was an operations manager for Biomet, and was based in Warsaw, Indiana.

13. "Associate Regional Manager," a U.S. citizen, was the Associate Regional Manager for Biomet International in Asia/Pacific, and was based in Hong Kong SAR.

14. "President of International Operations," a U.S. citizen, was the President of International Operations for Biomet and was based in Warsaw, Indiana.

15. "Doctor," a citizen of the People's Republic of China, was head of orthopedics at a Chinese public hospital in Shanghai.

*Background*

16. Argentina has a public healthcare system wherein approximately half of hospitals are publicly owned and operated. Health care providers ("HCPs") who work in the public sector are government employees, providing health care services in their official capacities. Therefore, such HCPs in Argentina are "foreign officials" as that term is defined in the FCPA, 15 U.S.C. § 78dd-1(f)(1)(A).

3

17. Brazil has a socialized public healthcare system that provides universal health care to all Brazilian citizens, and the majority of hospitals are publicly-controlled. HCPs who work in the public sector are government employees, providing health care services in their official capacities. Therefore, such HCPs in Brazil are "foreign officials" as that term is defined in the FCPA, 15 U.S.C. § 78dd-1(f)(1)(A).

18. China has a national healthcare system wherein most Chinese hospitals are publicly owned and operated. HCPs who work at publicly-owned hospitals are government employees, providing health care services in their official capacities. Therefore, such HCPs in China are "foreign officials" as that term is defined in the FCPA, 15 U.S.C. § 78dd-1(f)(1)(A).

## COUNT ONE
### (Conspiracy)

### THE CONSPIRACY AND ITS OBJECT

19. Paragraphs 1 through 18 of this Information are realleged and incorporated by reference as if set out in full herein.

20. From in or around 2000 through in or around 2008, within the territory of the United States and elsewhere, defendant Biomet and others, known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree to commit the following offenses against the United States:

    a. to offer, pay, promise to pay, and authorize the payment of money and other things of value, to a person, while knowing that all or a portion of such money or things of value would be offered, given, or promised, directly or indirectly, to foreign officials of Argentina, Brazil, and China for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv)

inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendant Biomet and others in obtaining and retaining business for and with, and directing business to, defendant Biomet, in violation of Title 15, United States Code, Section 78dd-1; and

      b.    to knowingly falsify, and cause to be falsified, books, records, and accounts which were required, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of Biomet, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m and 78ff.

## PURPOSE OF THE CONSPIRACY

21.    The purpose of the conspiracy was to secure lucrative business with hospitals in the Argentine, Brazilian, and Chinese public health care systems by making and promising to make corrupt payments of money and things of value to publicly-employed HCPs.

## MANNER AND MEANS OF THE CONSPIRACY

22.    To achieve the objects and purpose of the conspiracy, defendant Biomet and others used the following manner and means, among others:

      a.    It was a part of the conspiracy that defendant Biomet, certain of its executives, employees, and subsidiaries agreed to pay publicly employed Argentine HCPs 15-20 percent commissions in exchange for the purchase of Biomet products.

      b.    It was a further part of the conspiracy that defendant Biomet, certain of its executives, employees, and subsidiaries agreed to pay Brazilian HCPs 10-20 percent commissions through Brazilian Distributor in exchange for the purchase of Biomet products.

c. It was a further part of the conspiracy that defendant Biomet, certain of its executives, employees, and subsidiaries agreed to pay Chinese HCPs commissions through Chinese Distributor, and paid for travel for Chinese HCPs, in exchange for the purchase of Biomet products.

d. It was a further part of the conspiracy that at the end of Biomet's fiscal year from in or around 2000 to in or around 2008, defendant Biomet, its executives, employees, and subsidiaries falsely recorded the payments on its books and records as "commissions," "royalties," "consulting fees," "other sales and marketing," and "scientific incentives," in order to conceal the true nature of the payments in the consolidated books and records of Biomet Argentina, Biomet International, Scandimed, and Biomet China, which books and records were incorporated into the books and records of Biomet for purposes of preparing Biomet's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

e. In total, from 2000 to 2008, defendant Biomet, Biomet Argentina, Biomet International, Scandimed, and Biomet China, and their related subsidiaries and employees, authorized the payment, directly or indirectly, of at least $1.5 million, some or all of which was paid to publicly-employed HCPs to induce the purchase of Biomet products.

## OVERT ACTS

23. In furtherance of the conspiracy and to accomplish the unlawful objects, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

*Argentina*

24. Beginning prior to 2000, publicly-employed Argentine physicians who implanted Biomet products sent invoices to Biomet Argentina, which, on their face, were for professional services or consulting, but doctors were actually being paid a commission to induce the purchase of the product, which ranged from 15-20 percent of Biomet's sales.

25. Starting in 2000, after the Argentine tax authorities forbade tax-free payments to surgeons, Biomet Argentina recorded the payments made on the invoices falsely as "royalties" or "other sales and marketing."

26. On or around February 7, 2000, a memo was circulated in Biomet's Miami office, including to Operations Manager, about opening a direct-sales operation in Argentina, in which he included a budget allocation of "13-20% commission to surgeon."

27. In or around 2001, Biomet purchased a company in Argentina through which it began making direct sales.

28. On or around February 28, 2003, Director of Internal Audit circulated an internal audit report on Argentina to Vice President, Operations Manager, and others in Biomet in Indiana, in which he states, "[R]oyalties are paid to surgeons if requested. These are disclosed in the accounting records as commissions."

29. In or around August 2005, the managing director of Biomet Argentina raised concerns regarding potential payments to customs officials and requested an internal audit.

30. From in or around September 2005 to in or around October 2005, Director of Internal Audit, Latin America Auditor, and others from the Internal Audit, Legal, and Compliance Departments of Biomet conducted an investigation into the allegations of the managing director of Biomet Argentina.

31. On or around January 10, 2006, the managing director of Biomet Argentina sent an email to Latin America Auditor in Indiana that attached a monthly list of payments to doctors that were a percentage of the cost of products purchased by the doctor during the month.

32. On or around February 22, 2006, Latin America Auditor circulated an internal report on the audit to Vice President, Operations Manager, and others, which stated, "Other allegations being investigated by Biomet's legal team include fraudulent product registration certificates, bribery of customs officials, and other charges as reported to legal via electronic media. It was later determined that certificates were fraudulent and bribes were made [sic]."

33. In or around November 2006, Latin America Auditor sent her report on the audit of Biomet Argentina to Vice President, Operations Manager, and others in Indiana, which stated, "The commission expense recorded on the income statement is actually royalties paid to doctors for using Biomet products. This account should be renamed to royalty's [sic] expense."

34. On or around February 26, 2007, an employee of Biomet Argentina emailed Latin America Auditor information regarding cash disbursements, which stated, "Payment for surgeon commissions: the payments for surgeon commissions will be made on the 20th of each month."

35. On or around December 7, 2007, a sales and marketing manager for Latin America for Biomet sent a report on a visit to Biomet Argentina to Operations Manager, in which he noted as an issue of concern, "Doctors receive a 'consulting fee' for every surgery."

36. On or around February 19, 2008, a sales and marketing manager for Biomet Argentina sent a list of payments made to physicians to the managing director of Biomet Argentina.

37. In or around March 2008, the managing director of Biomet Argentina again reported the payments to surgeons to internal compliance personnel.

38. On or around August 7, 2008, Biomet Argentina sent its financial report, which included 15-20% commissions to surgeons, to Operations Manager and others in Indiana

39. In or around August 2008, Biomet distributed new compliance guidelines that emphasized the FCPA and related issues, and the company's managing director for Argentina sought advice from the company's lawyers, causing Biomet to suspend payments to Argentine doctors.

40. In or around December 2008, Biomet suspended all sales in Argentina.

41. In total, from 2000 to 2008, defendant Biomet, Biomet Argentina SA, and their related subsidiaries and employees, authorized the payment, directly or indirectly, of approximately $436,000 in cash incentives to publicly-employed Argentine HCPs to induce the purchase of Biomet products.

*Brazil*

42. On or around August 15, 2001, Brazilian Distributor emailed Vice President in Indiana, copying Director of Internal Audit and others, noting that Brazilian Distributor was paying "commission [sic] to doctors"

43. On or around February 20, 2002, Director of Internal Audit sent a memo to Vice President and Operations Manager regarding a limited audit performed of the books and records of Brazilian Distributor, in which he stated, "[Brazilian Distributor] makes payments to surgeons that may be considered as a kickback. These payments are made in cash that allows the surgeon to receive income tax free.... The accounting entry is to increase a prepaid expense account. In the consolidated financials sent to Biomet, these payments were reclassified to expense in the income statement."

44. On or around August 21, 2003, Brazilian Distributor emailed Vice President in Indiana, copying Operations Manager, Director of Internal Audit, and others, stating "Prepaid now was fully reclassified to expenses accounts, commissions to doctors continue to be the major item...."

45. On or around February 19, 2004, Biomet Argentina forwarded the 2003 financial statements of Brazilian Distributor, which included the 20% commissions to doctors as "commissions," to Operations Manager in Indiana.

46. On or around February 20, 2004, Operations Manager forwarded the financial statements of Brazilian Distributor to Vice President.

47. In or around April 2008, Biomet sent accountants and outside counsel to Brazil to conduct due diligence, during which Brazilian Distributor admitted that they paid doctors for buying Biomet products and described the payments as "scientific incentives."

48. In or around May 2008, Biomet terminated its relationship the Brazilian Distributor.

49. In total, from 2001 to 2008, defendant Biomet, Biomet International, and their related subsidiaries and employees, authorized the payment, directly or indirectly, of more than $1.1 million to Brazilian Distributor, knowing that some or all of which would be used to pay cash incentives to publicly-employed Brazilian HCPs to induce the purchase of Biomet products.

*China*

50. On or around February 1, 2001, China Distributor sent an email to Associate Regional Manager, stating that the distributor was paying a 10-15% "rebate" to surgeons on the sale of Biomet artificial hips.

51. On or around February 2, 2001, Associate Regional Manager sent an email to Biomet in the United Kingdom, noting that Scandimed "offer[s] higher-than-average 'commission' to surgeons...."

52. On or around February 6, 2001, a Scandimed employee emailed President of International Operations in Indiana and Biomet employees in the United Kingdom, stating, "Re. 'commission' to surgeons, Scandimed has no control over this... as we understand it, giving commission [sic] or gifts of various kinds to surgeons is common in China."

53. On or around February 6, 2001, President of International Operations responded to the Scandimed email, copying Operations Manager, stating, "[T]he only problem with a company paying high commissions in a tight market is that the prices must be low enough to the dist[ributor] to allow for these high commissions..."

54. On or around April 10, 2001, Chinese Distributor sent an email to President of International Operations, copying Associate Regional Manager, discussing a doctor who was trying to stop commissions being paid to physicians by medical device companies.

55. On or around May 18, 2001, Chinese Distributor sent an email copying Associate Regional Manager, stating "[Doctor] will become the most loyal customer of Biomet if we send him to Switzerland."

56. On or around May 21, 2001, Chinese Distributor sent an email to Associate Regional Manager, copying Vice President, President of International Operations, and Operations Manager, stating "[Doctor] is the department head of [public hospital]. [Doctor] uses about 10 hips and knees a month and it's on an uptrend, as he told us over dinner a week ago.... Many key surgeons in Shanghai are buddies of his. A kind word on Biomet from him goes a

long way for us. Dinner has been set for the evening of the 24th. It will be nice. But dinner aside, I've got to send him to Switzerland to visit his daughter."

57.    On or around January 29, 2002, Associate Regional Manager prepared a summary of distribution in China, noting, "Chinese surgeons typically receive a commission on sales, which can range from 5% to 25%. Distributors are expected to hold banquets for surgeons, and to sponsor meetings."

58.    In or around March 2002, in connection with a field visit to review operations in China, Biomet employees, including Associate Regional Manager, Vice President, and President of International Operations, discussed "commissions" paid to doctors of up to 20 percent for sales and "consulting fees" paid to doctors for conducting clinical trials; the discussion also included a proposal for a two week visit for Chinese doctors to the United Kingdom, with the second week being a "holiday" paid for by Chinese Distributor.

59.    On or around April 21, 2002, Chinese Distributor sent an email to Associate Regional Manager discussing payments to surgeons, stating, "When we say 'Surgeon Rebate included', it means the invoice price includes a predetermined percentage for the surgeon. For example, a vendor invoices the hospital for a set of plate & screws at RMB 3,000.00. The vendor will have to deliver RMB 750.00 (25% in this case) in cash to the surgeon upon completion of surgery [sic]."

60.    On or around March 14, 2005, Director of Internal Audit instructed an auditor to classify improper payments being made to doctors in connection with certain clinical trials as "entertainment."

61. On or around December 28, 2005, an employee of Biomet China emailed Associate Regional Manager, noting that doctors conducting certain clinical trials are paid a 10-15% "consulting fee."

62. In or around late 2006, Biomet ended its relationship with the Chinese Distributor.

63. From on or around October 6 through on or around October 13, 2007, Biomet China sponsored the travel of 20 surgeons to Barcelona and Valencia for training, including a substantial portion of the trip being devoted to sightseeing and other entertainment at Biomet's expense.

64. On or around October 11, 2007, the product manager for Biomet China sent an email to Associate Regional Manager, discussing ways to evade efforts by the Chinese government to halt corruption in health care by requiring all international companies to declare actual cost for import to the government, noting, "Obviously, China government [sic] doesn't have ability to forbid the corruption from hospitals & surgeons…," proposing four methods for avoiding the regulation, including falsified invoices.

(All in violation of Title 18, United States Code, Sections 371.)

## COUNT TWO
## (Foreign Corrupt Practices Act)

65.  Paragraphs 1 through 18 and 24 through 41 of this Information are re-alleged and incorporated as if fully set forth herein.

66.  From in or around 2000 through in or around 2008, within the territory of the United States and elsewhere, defendant Biomet, Inc., an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(h)(1)(B), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, and aided and abetted the same, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist defendant Biomet, Inc. in obtaining and retaining business; to wit, in order to induce the purchase of Biomet products by Argentine HCPs, defendant Biomet made and caused to be made, directly and indirectly, improper payments totaling approximately $436,000, knowing that some or all of the money would be paid to publicly-employed Argentine HCPs.

(All in violation of Title 15, United States Code, Section 78dd-1 and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Foreign Corrupt Practices Act)

67. Paragraphs 1 through 18 and 42 through 49 of this Information are re-alleged and incorporated as if fully set forth herein.

68. From in or around 2001 through in or around 2008, within the territory of the United States and elsewhere, defendant Biomet, Inc., an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(h)(1)(B), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, and aided and abetted the same, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist defendant Biomet, Inc. in obtaining and retaining business; to wit, in order to induce the purchase of Biomet products by Brazilian HCPs, defendant Biomet made and caused to be made, indirectly through distributors, improper payments totaling more than $1.1 million, knowing that some or all of the money would be paid to publicly-employed Brazilian HCPs.

(All in violation of Title 15, United States Code, Section 78dd-1 and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Foreign Corrupt Practices Act)

69. Paragraphs 1 through 18 and 50 through 64 of this Information are re-alleged and incorporated as if fully set forth herein.

70. From in or around 2001 through in or around 2006, within the territory of the United States and elsewhere, defendant Biomet, Inc., an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(h)(1)(B), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, and aided and abetted the same, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist defendant Biomet, Inc. in obtaining and retaining business; to wit, in order to induce the purchase of Biomet products by Chinese HCPs, defendant Biomet made and caused to be made, directly and indirectly through distributors, improper payments and travel and entertainment, knowing that some or all of the money would be paid to publicly-employed Chinese HCPs.

(All in violation of Title 15, United States Code, Section 78dd-1 and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Foreign Corrupt Practices Act, 15 U.S.C. § 78m, 18 U.S.C. § 2)

71.  The allegations of paragraphs 1 through 18 and 24 through 64 of this Information are realleged and incorporated by reference as though set in forth in full.

72.  From in or around 2000 to in or around 2008, in the District of the District of Columbia and elsewhere, defendant Biomet, Inc., an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(h)(1)(B), knowingly circumvented and knowingly failed to implement a system of internal accounting controls, and at the end of each of Biomet's fiscal years, the books and records of Biomet Argentina, Biomet International, and Biomet China knowingly contained false characterizations of bribes paid to publicly employed HCPs, as "commissions," "royalties," "consulting fees," "other sales and marketing," "scientific incentives," and "consulting fees," and those books and records were incorporated into the books and records of Biomet for purposes of preparing Biomet's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

(All in violation of Title 15, United States Code, Sections 78m(b)(2)(A) and (b)(5) and 78ff and Title 18, United States Code, Section 2.)

JEFFREY KNOX
Principal Deputy Chief, Fraud Section

By: _____
KATHLEEN M. HAMANN
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 305-7413

Date: March 21, 2012

17